Good morning. Hunter Ferguson on behalf of Neil Grenning. I'd like to reserve four minutes for rebuttal, and I'll keep track of my time. Okay. I'd like to begin by discussing the effect of Chappelle v. Mandeville, which is the case that the court asked the parties to address today. Before doing so, I'd like to note at the outset that even if the court were to find that defendants here are entitled to qualified immunity, that would not eliminate Mr. Grenning's claims for declaratory and injunctive relief. With regard to Mr. Grenning's damages claims, Chappelle does not dictate a finding of qualified immunity here because the critical evidence that was absent in Chappelle is actually present here. The court found it significant in Chappelle that there was no allegation or evidence that Chappelle lost any sleep or was deprived of sleep during his contraband watch. In contrast, Mr. Grenning specifically alleged, and there's evidence, that he was sleep-deprived during his 13 days of confinement in the SMU. So recognizing the clearly established right under Kenan that there is no penological justification for requiring an inmate to suffer psychological harm and physical harm under 24-hour lighting, a reasonable officer here would recognize that the 24-hour lighting policy at Arroway Heights was in fact violating Mr. Grenning's clearly established right. Depending on the intensity, I suppose. Yes, Your Honor. That raises a fact issue. Here, the intensity of the lighting is by several orders of magnitude much brighter than any of the other district court cases where the courts found that the lighting was of relatively low intensity, really like a night light. Here what we're talking about is a four-foot long fluorescent tube that is used for industrial and office lighting. Granted, there is some sort of a light-diffusing sleeve that covers the light, but the record is undisputed on this point that light meter tests at bunk level, where the inmate's head would be resting while trying to sleep, that it measures anywhere from about 10 to 12 1⁄2 foot candles. I'm not a lighting expert, but the materials produced by defendants show that that's equivalent to having 12 candles only about a foot from one's face, which is significantly brighter than the fraction of a foot candle found in Willis v. Terhune or the Walker v. Woodward case from the Southern District and Eastern District of California. The point is whether or not, to me, I can't speak for the other members of the panel, but to me the point is whether or not it was clearly established that constant illumination, regardless of the magnitude, violates the Eighth Amendment when done for a legitimate, penological purpose. So in this case, if the correctional official said that there was a purpose for having that level of light, wouldn't that then establish that there was no clearly established law? No, for three reasons. Number one, Kenan is unequivocal on this point that there is no penological justification for requiring an inmate to suffer physical or psychological harm under 24-hour lighting. Now, there's obviously a disagreement among the Chappell panel as to what that means, but even accepting that there is a penological justification that would warrant light that causes harm, here there is no penological justification, as there was in Chappell where there was need for a contraband watch. There is a policy, or excuse me, there is not a policy according to the record. There is a practice of having 24-hour lighting on the basis that inmates in the segregation management unit pose security threats, but there's no evidence that Grenning posed any security threat. There's no evidence that he was a risk of harm to himself, to other inmates, to any of the correctional officers. In fact, there is a document in the record which didn't cite in the briefing and only noticed this upon further review. It's at SER 416 and 420. It's called the Administrative Segregation Recommendation. There are five boxes that a corrections officer has to check as to why an inmate is being placed in the SMU. One, is he a risk to himself, a threat to others, to officers, or is he, quote, a threat to orderliness of the facility? The box that was checked for Mr. Grenning is that last one. He posed no security risk, and there is no justification, therefore, to house him under 24-hour lighting. So is your argument that the record reflects that the lighting is adjusted depending on why the person was placed into administrative segregation? No. The policy, no matter the reason, is my understanding from the record. The lights are on at the same intensity in every cell in the SMU 24 hours a day, no matter why anyone is placed there, whether that person is the instigator of a fight, the victim of a fight, or is placed there by mistake. They're still going to be subject to the same 24-hour lighting no matter what. Let me ask you another question. It doesn't look like he's asking for damages. It looks like he's only asking for declaratory and injunctive relief. Is that correct? He's seeking damages for his time and attorney fees, which, frankly, aren't really compensatory damages. Time and attorney's fees, isn't that what he's asking for is something like costs of suit? Yes. And so if I bring in declaratory and injunctive relief action, and that's all I want is equitable relief, I suppose in proper circumstances I can get attorney's fees, right? He could if he were represented at the trial court. Yeah. Okay. So you think there is a damage claim as such here anyway? I think you said that. On remand, if the case is remanded and Mr. Grenning were to have trial counsel, he would be able to seek attorney fees, which would be separate from a claim for damages. But his claim is really for declaratory and injunctive relief. He's not seeking traditional tort damages. Now, if we're only after prospective relief, that is to say declaratory and injunctive relief, how do we get around Lyons? Lyons v. City of Los Angeles. And there you're speaking to mootness? Yes. This is a classic example of a case. Mootness or standing, I mean, take your pick. First of all, it's a classic case of a harm that is capable of repetition yet evading review. As Mr. Grenning pointed out in his response briefing to the trial court, while this case was pending, he was put back in the SMU, and that's at SCR 292. So that's an example there. What about the standing concern? Well, he has standing in this instance because he, although the threat of the harm is not imminent, he stands to be placed back in SMU, but he's also seeking. But only if he engages in conduct that will subject him to a placement, and why should we anticipate that he would do that? It's not only based on his conduct. Inmates can be placed in the SMU, again, because they run afoul of the laws or because they are at risk from threats of violence from other inmates, or it's possible also that corrections officers believe there is a reason to place an inmate in the SMU, but they wind up being mistaken themselves. Isn't that speculative at this point? Is that enough to confer standing? In Mr. Grenning's case, it's not speculative because that latter point has actually happened to him. Now, you said SCR 292 that tells us that he was put back in the SMU later? Yes, Your Honor. I'm looking at 292 and I can't find it. Would you help me find it? Yes. Your Honor, I apologize. It's 291. Close. Mr. Grenning wrote in his brief to the trial court, since the incident plaintiff has been returned to the SMU for a four-day period from June 1st to June 4th, 2010. That's in the brief you said? Yes, Your Honor. Okay. So we might not be able to determine on the record in front of us whether it's moot or not. I mean, if likelihood of recurrence is an issue, we may have to send back to the district court on the point. And that would be appropriate in this instance. Okay. As I look at Lyons, I mean, Lyons, the question was whether or not this particular individual, Mr. Lyons, was going to be subjected to the chokehold in Los Angeles. And given the population of Los Angeles and the frequency or relative infrequency of the chokehold, I understand the court's concern that very unlikely to happen to Mr. Lyons again. Mr. Grenning's in a prison in which this is sort of established. How long is he in for? He will likely die there. How old is he? He's about 35. This may happen again. According to his prisoner record, he isn't eligible for earned release until 2096, and I doubt he will survive that long. As far as the possibility as to him, at any given time, the record says that as many as 40 inmates are housed in the SMU. I think it houses up to 64 individuals. And to the other point, there is also a well-established record of several other complaints, no fewer than at least 15 other inmates making the same essential complaint that Mr. Grenning has. Other features that distinguish this case from Chappelle as to duration, there the court noted that the contraband watch lasted only seven days. Here it was twice as long. I'm not sure it's appropriate to set any kind of minimum threshold, but at least in this instance we're talking about an amount of time that's significantly longer than that was the issue in Chappelle. Another point to make is that here, unlike in Chappelle, there is actual evidence of physical harm because of the lighting. Mr. Grenning alleged and has evidence that he suffers from and incurred migraine headaches during his confinement. The state has acknowledged that that is more than de minimis injury. That, too, makes this case different and fully satisfies the elements identified in Keenan. Well, Chappelle is a whole different game, isn't it? And Chappelle is a whole different set of facts and situation, too, is it not? I don't even quite see why it dovetails with this case especially at all. That was a situation where somebody was on what they said it was. He was on basically drug watch. Right. And the question was how you keep him from secreting the drugs while you're watching to see if the drugs are coming through. Yes, Your Honor, and that justification there for having the conditions in Chappelle, they simply do not obtain here in any form for Grenning's situation. That I'd like to reserve the remainder of the time. All right. Thank you. Good morning. Kevin Elliott, Assistant Attorney General, on behalf of the respondents in this matter. May it please the Court. The respondents are asking the Court to affirm the dismissal of the Eighth Amendment claim, and that Eighth Amendment dismissal should be affirmed for several reasons. I would also like to start on the qualified immunity issue, given that it was pointed out by the Court as something that it wanted to hear about. Qualified immunity, as the Court is aware, does protect prison officials, provided that their conduct does not violate a clearly established law. With respect to Chappelle, that case did hold that it was not clearly established that subjecting an inmate to continuous lighting for seven days, where the continuous lighting was used for penological purposes, was a violation of the Eighth Amendment. In reaching that conclusion, the Court did acknowledge that Kenan is the only Ninth Circuit case where the issue of constant illumination is addressed. The Court drew distinctions between the facts of Kenan and the facts in Chappelle, namely that the time period was different, as Kenan was claiming a sleep deprivation of over six months. Also, in Kenan, there was no legitimate penological justification for continuous lighting offered, but there was justification offered in Chappelle. And I think it's interesting to note that those same distinctions I just mentioned are also present in our present case at bar. The time period... So what are the penological justifications in this case? The offenders placed in the SMU do pose a greater risk to the facility. They require much more constant supervision. And the DOC policy requires that all offenders in SMU be observed at least every 30 minutes to make sure that they're not attempting self-harm or attempting to fashion a weapon or anything like that. So even if someone is placed into protective custody or administrative segregation because of threats to that person, they're still considered a threat to the institution? Well, they can be considered a threat to themselves and that they may be attempting self-harm given that they are threatened in general population. But are they being threatened by the population? Sorry? So somebody's being threatened by a gang in the population. Right. And so they put him in protective custody. And what's the reason that he has to be under illumination? Because of what? Conceivably, he could be attempting self-harm. Well, I guess anybody in prison can be attempting self-harm at any time. There are lots of reasons to do it, I suppose. That's true. That is true. I don't quite understand that as being any kind of justification. We're the government. We're here to help. Is that the idea? Well, I think that the facility has an interest in maintaining the health and safety of both the offenders and the staff. By illuminating them at all times? The illumination allows them to make sure that that's taking place. And the offenders placed in SMU are bright. What is extraordinarily bright illumination? I'm sorry? What if they said, well, it has to be very bright so we can really see what's going on, like as in Chappelle, so we can really see what's going on? Right. That would be okay, too, huh? The light is sufficiently bright that they can see what's going on. But again, there's three lights in the cell, two of them. That's all facts. I'm not talking about your facts. I'm talking about your principle. Your principle is that if everybody in the shoes gets big lights because it's important to be able to really understand what's going on, then that would be okay, in your view. A la Chappelle, that would be okay. That's fine. If they're placed in SMU, then yes. Obviously, the offenders in general population don't have this. Even if they're not offenders. They're just folks who somebody wants to attack because he won't join their gang. Right? No. Even so, he should be under this kind of light. No, because this is a penological interest. So this is dealing with offenders who are in prison, not someone out on the street who may be... I'm talking about people in prison, sure. I agree. Somebody says, we want you to join our prison gang. We want you to join MA. He says, no, I'm not going to join prison gang. So they put him in protective custody. If he were to request that... I'm not saying that he necessarily would just based on that request, but that is a possibility. That is, again, one reason that offenders are placed in the SMU is if they request protective custody. Well, what Judge Fernandez is driving at, I think, and it concerns me as well, we see on ER 416 and then again the same form on 420, that various things could be checked. For example, threat to self, threat to others, threat to security, as reasons for putting somebody in here. So the penological justification for we've got him on suicide watch clearly is there as a possibility on the form, but the form for Mr. Grenning is none of those. Rather, it's threat to orderliness of the facility, and that's a pretty broad and generic category. Again, he's in there because there was a fight. I don't know the detail of the fight, whether he was attacked or whether he was the instigator. I just don't know. And I don't know that either. So it's entirely possible that this was a fight in which he was attacked and that he's in the SMU for a very good reason, to protect him against further attacks. So I don't understand, and in a way I guess I'm just beating a dead horse, but I don't understand why in that circumstance there's a legitimate penological justification for 24-hour lighting of this brightness. Okay. My understanding is that he was placed in SMU pending an investigation of a fight that he was involved in. Again, I don't know the underlying facts or how that investigation played out, but during the time he was in SMU, Department of Corrections officials were investigating whether he, and at that point they did not know whether he was the instigator, the victim, or someone who just got caught in the middle. But whether the instigator, caught in the middle, the victim, I don't understand why that means he needs to be supervised for his own protection, for protection of the institution. I mean, why don't we let the guy sleep? Well, again, I don't think there's any real evidence in the record that he couldn't sleep. Well, no, he says he couldn't sleep. Right. I mean, that's evidence. You may not believe it, but it's evidence. Well, it's evidence that's not supported by any medical records, either in his complaint or at the summary judgment stage. He also declines to provide any kind of evidence aside from his own self-serving assertions, basically. Well, you know, a lot of people say things that are true and to their own advantage, and they are thereby self-serving, but they're also true. And that's what sworn testimony is for. That's what affidavits are for. Was there any evidence in the record that corrections officials who observed him, observed him sleeping during the periods that he's contending that the light interrupted his sleep? I believe that the SMU policy dictates that they're to be checked every 30 minutes. Basically, there's supposed to be a tear check or a cell check every 30 minutes, and that interaction is to be logged. So I believe Mr. Grenning in his reply brief pointed out that, you know, in that log that's in the supplemental excerpts of record, every notation indicated that he was awake. I think what that indicates is that those were instances in which he interacted in some way with the observing staff member. But I don't believe that every 30 minutes, if he's asleep, that that is logged. So there's no evidence that he was asleep, but again, I think the fact that the log indicating that he was awake every time it's noted, doesn't mean that he didn't sleep during that time. It just means that... The log entry is a little confusing. It seems to me at least possible that the log entry is made every time he's checked on, and it's possible that the log entries are quite widely spaced because he's not checked on very frequently. Right, and I don't think that's the case. I think because, you know, the policy is pretty clear, and the staff who work in SMU, I think, take that policy pretty seriously, that they need to check every 30 minutes per policy to make sure that... Is there something in the record that tells us that they've checked on the log only when there's interaction? Yeah, I believe it's in... I'm sorry, I don't have the supplemental excerpt of the record, but it is in one of the declarations supported... That's a critical point, okay. Yeah, so... With respect to getting... Just to kind of finish up on Chappell, I just wanted to indicate that the differences pointed out between Chappell and Heenan are also present in this case, and that the time period is vastly different. We've got 13 days, you know, less than two weeks versus over six months, and we've also got a penological justification presented, where in Heenan there simply wasn't one presented. So those differences do apply in this case as well, and I think that the court also acknowledged that, you know, Heenan is the only case on point in the Ninth Circuit. Cases outside the Ninth Circuit regarding constant illumination are so fact-driven they precluded fair notice that what the defendants were doing was unconstitutional. I'm sorry, please. You're talking about qualified immunity now? Yes. And if all he really wants is declaratory and or injunctive relief, it doesn't really matter, does it? To the extent that those two... Qualified immunity doesn't really matter in that instance, does it? Well, with respect to any attendant damages that he was seeking. If he's seeking no damages, right? I thought he was seeking nominal damages. Okay, but if we assume that he is seeking only declaratory and injunctive relief, then qualified immunity is out of the window, right? I believe it is, yes. And so then we're at whether or not there was a violation. So what's your position on that? If we take the qualified immunity rubric out of the discussion, where are you? Well, essentially that he failed to meet both the subjective and objective prongs of an Eighth Amendment claim. He also failed to show an actual injury. With respect to the objective standard of an Eighth Amendment claim, he would have to show that the alleged deprivation was objectively sufficiently serious. Again, looking to Kenan as the only Ninth Circuit case on point, the constant illumination is only sufficiently serious if the exposure is prolonged and if it causes severe mental or psychological problems. Do we have a copy of the complaint in the materials in front of us? I would think you would. I don't have the SER. I'd like to read it because I'm trying to figure out whether, in fact, we have damages that are at issue or not. The district court seemed to think damages were at issue. As I read the magistrate judge's order, that's what the magistrate judge seemed to think. Well, again, my understanding, I don't have a copy of the complaint right in front of me, but it is in the supplemental excerpts of record, and he did ask for nominal damages. Okay. In addition to failing to meet the objective standard of an Eighth Amendment claim, he also failed to meet the subjective standard. The superintendent, Ms. Miller-Stout, one of the defendants in this matter, did rely on a 1996 case which disposed of this issue. It wasn't named in the brief, but it can. The name of the case was provided to Mr. Grenning in discovery, and it was in the briefing in the court below. If you look to supplemental excerpt of record, page 60, it's Ridley v. Walter. The damages he asked for in his complaint are damages to cover his legal costs and time in bringing the complaint. I think he goes on to say something to the effect, and correct me if I'm wrong, but I think he goes on to say whatever other damages the court sees fit. What other relief? You know, like every legal person in the world puts a tag in on the end that says, grant such other relief as may approve proper. So I don't think that damages are really off the table, given that language. But again, if the court were to determine that they were, then that would have an effect on the qualified immunity issue. Mr. Grenning argues that the number of grievances submitted by the other offenders, I believe it was 15 over a period of about a decade, was sufficient to put the defendants on notice that there was a problem. The problem with that argument is that a grievance by itself is not sufficient to put Ms. Miller-Stout or any other defendants on notice that there's actually a constitutional violation occurring. If there were 15 medically documented examples of offenders suffering actual psychological or mental injury as a result of this lighting, that might be one thing, but that's not what we have here. No evidence, medical or otherwise, was provided to the defendants that would be sufficient to put them on notice. I have about 10 seconds left. I don't know if the court wanted to address the filing fee issue. Briefly, I did. On the damages issue, it appears in the complaint that the compensatory damages that were sought, as plaintiff's counsel alluded to, were the legal cost and time in bringing the complaint. Would that be compensatory damages, in your view, that would make qualified immunity come into play? I suppose it could if he had trial counsel. I don't believe he's entitled to. Attorney's fees proceeding pro se, and I have no doubt that he would attempt to secure counsel if he were able to, if this matter were to proceed to trial. Just on the issue of the deductions, I just wanted to state very quickly that a slight majority of circuit courts in this country do deduct simultaneously as opposed to sequentially, and the defendant's position is that that method of deduction furthers the goals of the Prison Litigation Reform Act. I understand that the parties have addressed this because an order of this court asked them to. I have trouble seeing why that's appropriate to come to us in the first instance rather than to the district court in the first instance. Well, and I did raise that issue in my brief, that this was not raised at any time in the lower court, and attempting to shoehorn the issue into this, what's essentially an unrelated appeal is not appropriate, but the court did ask us to address it. If you don't have any questions, then I won't waste time with it. Well, my question really is much more of whether it's appropriately before us at this time, without yet getting to pick up which side of the circuit we want to end up on. Okay. Unless there were further questions, respondents can simply ask that the court affirm the trial court below. Thank you. Thank you. Quickly on the damages question. At SCR 452, paragraph 63 of the complaint, Mr. Grenier asks for an award of compensatory damages jointly and severally against Ms. Miller-Stout, Mr. Dyson, and Mr. Fox. He states that what he wants is legal costs and time for bringing this complaint, but it's clear in the complaint that he seeks compensatory damages. As to the scope of those damages, the complaint is at best unclear. As to the issue of whether there's a requirement of showing of medical reports, there's simply no authority that requires such a showing. Whether Mr. Grenier made a complaint to the medical provider or not goes to the credibility of his testimony, but all inferences have to be drawn in his favor. On the question of the PLRA deductions, I would submit that the issue is properly before the court and not simply because the parties were asked to raise it, but because it arose on the appeal. It makes no sense to have Mr. Grenier file a separate civil action to address that and then incur a third set of fees and then incur potentially a fourth set of fees when that goes up on appeal. Unless the panel has any further questions, we'd ask for vacater and remand, please. Okay. Thank you very much. Thank you. Now, I think I'm correct in understanding that the Stoll-Reeves attorneys are doing this as a pro bono appointment. Yes, Your Honor. Win or lose, I have to say the court very much appreciates the contribution that you and other firms make to the court in taking these pro bono assignments. Thank you. Thank both sides for helpful arguments. The case of Grenier v. Miller-Stout now submitted for decision.
judges: Fernandez, Fletcher, Rawlinson